IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOLLY INGLETT,<br><br>        Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:10-cv-00257 JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF DEFENDANT MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF HOLLY INGLETT |

Holly Inglett ("Plaintiff") asserts she is entitled to disability insurance benefits under Title II of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in assessing the opinion of her treating physician. (Doc. 13 at 12). Therefore, Plaintiff seeks judicial review of the administrative decision denying her claim for benefits. For the reasons set forth below, the Court affirms, and Plaintiff's appeal is denied.

**PROCEDURAL HISTORY**[1]

Plaintiff filed an application for disability insurance benefits on March 10, 2007, alleging disability beginning November 3, 2002. AR at 85. The Social Security Administration denied her claim initially on July 27, 2007, and upon reconsideration denied the claim again on October 17,

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

1  2007. *Id.* at 56-59, 67-70.  After her request for a hearing was granted, Plaintiff testified before an
2  ALJ on July 10, 2009.  *Id.* at 35.

3        The ALJ determined Plaintiff was not disabled at any time from November 3, 2002, through
4  her date last insured, September 30, 2004.  AR at 21.  Therefore, the ALJ issued an order denying
5  benefits on September July 28, 2009.  *Id.* at 15-51.  Plaintiff requested a review by the Appeals
6  Council of Social Security on the ALJ's decision, which was denied on December 4, 2009.  *Id.* at 3-
7  5.  Therefore, the ALJ's determination became the decision of the Commissioner of Social Security
8  ("Commissioner").

## STANDARD OF REVIEW

10        District courts have a limited scope of judicial review for disability claims after a decision by
11  the Commissioner to deny benefits under the Act.  When reviewing findings of fact, such as whether
12  a claimant was disabled, the Court must determine whether the Commissioner's decision is
13  supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's
14  determination that the claimant is not disabled must be upheld by the Court if the proper legal
15  standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y*
16  *of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

17        Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a
18  reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S.
19  389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938).  The record as a whole
20  must be considered, as "[t]he court must consider both evidence that supports and evidence that
21  detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

23        To qualify for benefits under Title II of the Social Security Act, Plaintiff must establish she is
24  unable to engage in substantial gainful activity due to a medically determinable physical or mental
25  impairment that has lasted or can be expected to last for a continuous period of not less than 12
26  months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered disabled only if:

27      physical or mental impairment or impairments are of such severity that he is not only
unable to do his previous work, but cannot, considering his age, education, and work
28      experience, engage in any other kind of substantial gainful work which exists in the

national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## DETERMINATION OF DISABILITY

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1994). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 416.927, 416.929.

A.   Relevant Medical Evidence

On April 27, 2002, Plaintiff had x-rays taken of her left foot. AR at 310. Dr. Eleanor Fraser noted a history of trauma to Plaintiffs left foot, and stated, "The bony structures appear intact, without evidence of fracture. The joints are unremarkable. There is a small inferior calcaneal spur." *Id.* On May 3, 2002, Plaintiff's x-rays were interpreted by Dr. Martha Wiedman at Truxtun Radiology Medical Group, who found similarly, "The bony structures are unremarkable. The trabecular patterns are preserved. There are no fractures, dislocation or lytic or blastic lesions seen. A small bone spur projects from the planta calcaneus." *Id.* at 309. On May 17, 2002, Dr. Wiedman found "soft tissue swelling over the lateral malleolus," but again "no fracture or dislocation [was] seen." *Id.* at 308.

Dr. Jack Nadler's assessment on June 27, 2002, was that Plaintiff had RSD (reflex sympathetic dystrophy) and hypothyroidism. AR at 340. Dr. Nadler's impression was that Plaintiff

1  had neuropathic pain rather than local musculoskeletal, and he referred Plaintiff to a "neuro clinic."
2  *Id.* at 341.  Plaintiff was examined by Dr. Brouske, a neurologist, who then advised her to see Dr.
3  Robert Lawrence, an orthopaedic surgeon.  *Id.* at 342.  Dr. Lawrence opined that Plaintiff developed
4  RSD as a result of "lipfrank fracture dislocation of her left forefoot."  *Id.*  Dr. Lawrence expected
5  Plaintiff's RSD to subside, and stated Plaintiff should use a leg brace in conjunction with
6  medications diagnosed from Dr. Brouske "in the interim."  *Id.*  On September 4, 2002, Dr. Nadler
7  noted Plaintiff was on disability, and questioned, "Is this RSD?"  *Id.* at 339.

8      Plaintiff reported a fall on November 3, 2002.  AR at 168-69.  On November 11, 2002,
9  Plaintiff stated that on a scale of 0-10, her pain level was a "5."  *Id.* at 169.  At a follow-up
10 appointment one week later, Plaintiff said when using the prescribed muscle relaxer, her pain was
11 about a "3."  *Id*.  Dr. Nadler noted Plaintiff did not have RSD on November 22, 2002.  *Id.* at 169.
12 However, on December 4, 2002, Dr. Nadler completed a form for the Department of Human
13 Services, on which he stated Plaintiff was restricted in operating foot controls due to
14 "ankle—'RSD.'"  *Id.* at 332.  Dr. Nadler stated Plaintiff had the capacity to occasionally lift and
15 carry fifteen pounds, and frequently lift and carry ten pounds.  *Id.* at 331.  Plaintiff was occasionally
16 able to reach, but could never climb, balance, stoop, kneel, crouch, or crawl.  *Id.*  In addition,
17 Plaintiff could not stand or walk for more than two hours during the day, but could sit two to four
18 hours total.  *Id.*  Dr. Nadler believed Plaintiff's condition would last until March 2003.  *Id.* at 330.

19     On February 20, 2003, Plaintiff reported falling on her buttocks and hands at a store; she
20 extended her elbow and her palms hurt, and later that day Plaintiff had a spasm in her neck.  AR at
21 161.  Plaintiff reported her pain was "2-3" on the scale of 0-10.  *Id.*  Dr. Nadler ordered x-rays of her
22 spine.  *Id.*  Dr. Tony Deeths interpreted the x-rays of Plaintiff's cervical spine, finding: "The
23 vertebral bodies, disc spaces and posterior elements appear normal.  No fracture or dislocation is
24 seen.  The soft tissues are unremarkable."  *Id.* at 306.  Therefore, Dr. Deeths' impression was that
25 Plaintiff had a normal limited cervical spine.  *Id.*

26     Dr. Deeths saw Plaintiff again on May 13, 2003, after she tripped and fell at a yard sale.  AR
27 at 157, 305.  Plaintiff's x-rays of her right tibia and fibula showed that the bony structures were
28 "unremarkable" and there were "no fractures, dislocation or lytic or blastic lesions."  *Id.* at 305.  The

x-ray of her left ankle showed "considerable soft tissue swelling about the ankle… plantar calcaneal spur," and "bony fragment adjacent to the lateral malleolus, consistent with a fracture." *Id.* Shortly after the x-rays, Plaintiff reported a decrease in her pain from a "3" on May 24, 2003, to a "1" on May 30, 2003. *Id.* at 156, 159.

On August 29, 2003, Plaintiff complained of pain in her spine and hands, which she stated stemmed from a fall in November 2002. AR at 153. She requested a "disability form," but Dr. Robert M. Wolney stated that there were "no clinical findings, no swelling, no inflammation," and opined that Plaintiff had "exaggerated symptoms of factitious injury." *Id.* Upon referral from Dr. Wolney, Dr. Deeths evaluated x-rays of Plaintiff's bilateral hands, lumbosacral spine, and thoracic spine on August 29, 2003. *Id.* at 304. Dr. Deeths' impressions were as follows:

> Bilateral Hands: The bony structures are unremarkable. The trabecular patterns are preserved. There are no fractures, dislocations or lytic or blastic lesions seen.
>
> Lumbar Spine: The vertebral body heights are maintained without evidence of fracture or other pathology. Intervertebral disc spaces are persevered. The laminae, pedicles, spinous and transverse processes are normal. The sacrum and sacroiliac joints are unremarkable.
>
> Thoracic Spine: The vertebral body heights are normal. The disc spaces are preserved and the posterior elements are normal. The paravertebral soft tissues are unremarkable. No fracture or sublaxation is seen.

*Id.* (emphasis omitted). Similar to Dr. Wolney, Dr. Deeths opined that Plaintiff's bilateral hands, lumbosacral spine, and thoracic spine were all "normal." *Id.*

On September 22, 2003, Dr. Nadler observed Plaintiff's "RSD-like syndrome" had "improved over last two months." AR at 209. Further, Dr. Nadler noted Plaintiff complained that her hands sometimes made it hurt to hold pens or to write. *Id.* Also on September 22, Dr. Fraser performed a radiological consultation. *Id.* at 247. Dr. Fraser noted Plaintiff's history of left wrist separation, bilateral numbness in hands, and intermittent neck pain and low back pain. *Id.* Dr. Fraser found "[u]nremarkable cervical spine except for minimal disc space narrowing at the C5-C6 level, with minimal spurring as described," and an "[e]ssentially unremarkable lumbosacral spine." *Id.* In addition, Dr. Fraser found Plaintiff's wrists were radiographically normal; the bony structures of the right wrist were unremarkable and joints appeared normal; and the left wrist bony structures did not show abnormalities and the joints were unremarkable. *Id.*

In January 2004, Plaintiff saw podiatrist Holly Spohn to be evaluated for possible ankle braces. AR at 206. Plaintiff told Dr. Spohn that her ankles were "constantly twisting and [were] very unstable." *Id.* Dr. Spohn found "diminished sharp/dull and light touch." *Id.* Plaintiff's muscle tone was 5/5, and there were no ulcers, fissures, or cracks in the skin. *Id.* In addition, Plaintiff did not have edema, cellulitis, or infection. *Id.* Dr. Sophn observed: "There is some mild weakness in the lateral aspect of the ankles bilaterally and crepitus noted. Upon gate analysis there is adequate propulsion from heel to toe contact." *Id.* With these finding, Dr. Spohn declined to recommend ankle braces for Plaintiff, and suggested she "try physical therapy to increase stretching, strengthening, and range of motion of the ankles." *Id.* Dr. Spohn saw Plaintiff again in July 2004, approximately two weeks after Plaintiff reported spraining her right ankle when walking on uneven terrain. *Id.* at 203. Upon examination, Dr. Spohn stated Plaintiff's right foot had "full range of motion . . . muscle strength and tone." *Id.* There were no signs of "diminished integrity of the tendons or ligaments." *Id.* Therefore, Dr. Sophn opined Plaintiff would "heel [sic] well" if she continued icing and stretching her foot. *Id.*

After Plaintiff's date last insured, Dr. Nadler completed a form regarding her ability to do work on January 18, 2005. AR at 323-25. According to Dr. Nadler, Plaintiff could stand, walk or sit for less than two hours each during the day. *Id.* at 324. He opined the Plaintiff was restricted from using her hands, fingers, or feet for repetitive movements; and that Plaintiff was restricted from environmental factors such as heat, cold, dust, dampness and height. *Id.* Dr. Nadler offered no explanation for the restrictions related to repetitive movements or environmental factors. *Id.* In addition, Dr. Nadler opined Plaintiff could occasionally lift and carry ten pounds, but never fifteen or more pounds. *Id.* at 325. Occasionally, Plaintiff could climb, balance, stoop, kneel, crouch, or reach; but Plaintiff could never crawl. *Id.*

Dr. G. W. Bugg offered an assessment of Plaintiff's physical residual functional capacity on July 25, 2007. AR at 249-53. Dr. Bugg opined Plaintiff could occasionally lift and/or carry twenty pounds and could so frequently with ten pounds. *Id.* at 250. Plaintiff had the ability stand, walk, or sit with normal breaks for a total of six hours, each, in an eight-hour workday. *Id.* Further, Dr. Bugg opined that Plaintiff's ability to push and pull was unlimited; she could frequently balance, stoop,

1  kneel, and crouch; and occasionally crawl and climb ramps, stairs, ladders and ropes. *Id.* at 250-51.
2  According to Dr. Bugg, Plaintiff had no manipulative, visual, communicative or environmental
3  limitations. *Id.* at 251.

4  On August 4, 2009, Dr. Nadler completed another questionnaire regarding Plaintiff's ability
5  to do work, covering the period of time "from 2004 to 2009." AR at 344-45. Dr. Nadler opined that
6  Plaintiff could occasionally lift less than ten pounds due to her degenerative neck arthritis. *Id.* at
7  344. He stated that Plaintiff could stand and walk less than two hours in an eight-hour day because
8  of her chronic post-traumatic ankle/foot pain and sit for less than six hours total, for one hour at a
9  time. *Id.* at 344-45. Further, Dr. Nadler believed that Plaintiff's limitations limited her to never
10 climbing or crawling; occasionally stooping, kneeling, and crouching; and frequently balancing. *Id.*
11 at 345. In addition, Plaintiff's ability to reach and handle items was "limited." *Id.*

12 B.   Hearing Testimony

13 Plaintiff testified at the hearing before the ALJ on July 10, 2009. AR at 38. Plaintiff was
14 forty-seven years old and married. *Id.* at 39. Plaintiff said her husband, a former chef, stopped
15 working while she had two jobs; he became a "house husband," who then took care of her and the
16 house. *Id.* at 40. Plaintiff stated family members have been paying their bills since neither she nor
17 her husband has any income. *Id.* at 39. Also, Plaintiff said her husband is unable to return to work
18 because "his back is gone and he keeps losing feeling in his legs and his arm," but he could not apply
19 for benefits because "borrowing money just to go to the doctor for [Plaintiff] was hard enough." *Id.*
20 at 40.

21 According to Plaintiff, she received an associate of arts degree from Cerro Coso, specializing
22 in "[e]arly childhood development, psychology, and law." AR at 41. Plaintiff testified that the did
23 not attend further schooling or training, because two months before graduation, in 2002, she "bent
24 [her] left foot like a taco [with] heels and toe in the air, arch gone." *Id.*

25 Plaintiff said she fell in a local store, just after she stopped using a wheelchair for her
26 previous injury, on November 3, 2002. AR at 41-42, 44. Plaintiff stated this fall caused injury to her
27 "entire back . . . both hands and wrists," and she hyper-extended her right elbow. *Id.* at 43. In
28 addition, Plaintiff said she has suffered "muscle spasms in [her] right shoulder blade, neck and both

hands" from her fall. *Id.* at 46.  Plaintiff said she began treatment for these injuries the day after she fell, including "major pain medications" such as Neurontin, Flexeril and Darvocet. *Id.* at 43, 47. However, Plaintiff did not believe the medicine helped and instead made it difficult for her to think or focus. *Id.* at 48.  Plaintiff said surgery was proscribed for her ankle, but "it would take 28 operations to get a crutch." *Id.*

As a result of her fall, Plaintiff stated she "could barely move" from 2002 to September of 2004, and was in a wheelchair for at least a year; her mother "did all the driving and pushed [her] around in wheelchairs." *Id.* at 44.  Plaintiff said her doctor did not prescribe the wheelchair, but was aware that she used one that she borrowed. *Id.* at 46.  Plaintiff estimated that she was weighed 275 and 285 pounds when she fell, but "went up to 304" because of using the wheelchair. *Id.* at 47.  In addition, Plaintiff stated she was unable to use her hands since falling, and that she had arthritis, numbness, pain, weakness, and carpal tunnel. *Id.* at 45.  Consequently, Plaintiff stated she was unable to write or use a computer. *Id.*  Further, Plaintiff stated she had difficulty holding books. *Id.* at 48.  Plaintiff opined the heaviest object she could control with her hands was a gallon of milk since she fell. *Id.* at 45.  Since 2002, Plaintiff said she hurt her ankles "at least once a year falling." *Id.* at 43.

Plaintiff stated she was unable to work because the damage to her back, hands, and wrists "make it very difficult to work." *Id.* at 43.  She added, "There's very few places you can work that don't require you to either stand for at least half an hour or more or sit in a chair like this, which is very painful, or use a computer or phone, and I can't do that." *Id.*

Vocational expert ("VE") Ken Ferra testified at the hearing after Plaintiff.  The ALJ asked the VE to consider "a person of [Plaintiff's] age, education and past work experience,'" who was limited to work at the "light exertional level"[2] and could occasionally crawl or climb stairs and ramps.  AR at 49.  Also, the individual could never climb ropes, ladders or scaffolding, or use foot

---

[2] Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  1983 SSR LEXIS 30.  Further, the definition states "A job is also [light work] when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than sedentary work." *Id.*

8

controls that required pushing or pulling. *Id.* The VE opined "all of" Plaintiff's past relevant work was compatible with the hypothetical. *Id.* Specifically, the VE noted: "The office manager is classified as sedentary and skilled, SVP[3] 7. Literacy tutor, light and skilled, SVP 7. The cashier collection clerk, sedentary and skilled, SVP 5 . . . and the customer service representative, light and skilled, SVP 6." *Id.* at 50.

C.  The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity from the alleged onset date of November 3, 2002, through her date last insured, September 30, 2004. AR at 17. Second, the ALJ found Plaintiff has the following severe impairments: "left ankle instability due to history of left ankle/ foot fracture and morbid obesity." *Id.* These impairments did not meet or medically equal a listing. *Id.* at 18.

At the fourth step, to determine Plaintiff's residual functional capacity ("RFC"), the ALJ considered "the entire record." AR at 18; *see also* AR at 18-20. The ALJ determined Plaintiff had the RFC "to perform light work . . . except with the following limitations: no push/pull foot pedals; no climbing ladder, rope or scaffolds; occasionally climbing ramp/stars and crawling; and frequently balancing, stooping, kneeling and crouching." *Id.* at 18. Plaintiff was "capable of performing past relevant work as office manager, tutor, cashier and customer service representative." *Id.* at 20. Therefore, the ALJ concluded Plaintiff has not been disabled as defined by the Social Security Act from November 3, 2002, through September 30, 2004. *Id.* at 21.

## DISCUSSION AND ANALYSIS

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians, (2) examining physicians, who examine but do not treat the claimant, and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d. 821,

---

[3] "SVP," or specific vocational preparation, is defined as the amount of lapsed time required by a typical worker to learn techniques, acquire information, and develop the facility needed for average performance in a specific job position. Employment and Training Admin., U.S. Dep't of Labor, *Dictionary of Occupational Titles*, (4th ed. rev. 1991), page 1009. The *Dictionary of Occupational Titles* ("*DOT*") may be relied upon "in evaluating whether the claimant is able to perform work in the national economy. *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

9

830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). An examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2). Thus, the courts apply a hierarchy of deference to medical opinions based upon the nature of services provided.

A physician's opinion is not binding upon the ALJ when the ALJ provides "specific and legitimate" reasons for rejecting the opinion, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the court when there is "more than one rational interpretation of the evidence." *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Notably, the opinion of a treating physician may be rejected whether or not the opinion is contradicted by another. *Magallanes*, 881 F.2d at 751. Plaintiff argues that the ALJ improperly disregarded the opinion of her treating physician, Dr. Nadler, by failing to state specific and legitimate reasons for giving the opinion less weight. (Doc. 13 at 8, 19-12).

In explaining the weight given to the various medical opinions, the ALJ stated the opinion of Dr. Nadler, Plaintiff's treating physician, was "contrary to objective evidence and clinical findings; the determination of disability is reserved to the Commissioner; it is inconsistent with treatment notes, including his own; and it is contrary to the other medical opinions in the record." AR at 20. Evaluating the medical evidence, the ALJ noted:

> Treatment notes, objective evidence, and clinical findings and treating source opinion do not support the extent of limitations and severity of pain alleged by the claimant. . . the x-ray studies of the hands and wrists were normal. The x-ray studies of the cervical spine, lumbar spine and thoracic spine were unremarkable except for minimal disc space narrowing at C5-C6 with minimal spurring and very slight anterior spurring of L4. The claimant's treating source interpreted the x-rays of her spine as normal.

> Clinical findings corroborate the results from the x-ray studies. The claimant had some diminished sensation and weakness in her ankles and her treating source opined that she hand ankle instability. However, the treatment notes contained clinical findings of normal appearing hands, full range motion in her ankles and 5/5 muscle tone in her lower extremities.

AR at 19-20 (internal citations omitted). Therefore, the ALJ gave "little weight" to the opinion of Dr. Nadler regarding Plaintiff's disability. *Id.* at 20.

A.   Dr. Nadler's opinion was inconsistent with his own records, which is a specific and legitimate reason for rejecting the opinion.

The Ninth Circuit held that incongruity between a treating doctor's assessment and his medical records provides a specific and legitimate reason for rejecting the opinion. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). In *Tommasetti*, the treating physician completed a residual functional capacity questionnaire in which she indicated the claimant could sit a maximum of four hours in an eight-hour workday, stand for up to two hours, and only lift 10 pounds. *Id.* at 1037. However, the ALJ found that these conclusions "did not mesh with [the doctor's] objective data or history" and that the "medical records do not provide support for the limitations set out in the [q]uestionnaire." *Id.* at 1041. Similarly, here the ALJ found that the physical limitations set forth by Dr. Nadler were not supported by the medical records. *Id.* at 20. Thus, the ALJ set forth a specific, legitimate reason for giving less weight to the opinion of Dr. Nadler regarding Plaintiff's ability to work.

B.   The ALJ set forth substantial evidence in his decision to reject Dr. Nadler's opinion.

An ALJ may disregard the opinion of a treating physician when his opinion is not supported by the medical record or there is conflicting medical evidence. *See, e.g., Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1463-64 (9th Cir. 1995); *Magallanes*, 881 F.2d at 751. If contradicted by another physician, the treating physician's opinion may be rejected when "specific and legitimate reasons for doing so that are based on substantial evidence in the record. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983); *Lester*, 81 F.3d at 832. This burden can be met by the ALJ "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751; *Lester*, 81 F.3d at 832.

Here, the ALJ cited the record as evidence for his rejection, including treatment notes of Dr. Nadler, the opinion of another treating physician, and the opinion of a state agency physician. AR at 20.

*Treatment notes of Dr. Nadler*

Though Dr. Nadler several ordered x-rays for Plaintiff, frequently the results were interpreted as normal or "unremarkable" by the referring physicians, as noted by the ALJ. AR at 19-20; *see also, e.g.,* AR at 153 (x-rays of Plaintiff's spine appeared normal); AR at 161 (same); AR at 304 (Plaintiff's hands, lumbosacral spine, and thoracic spine were all "normal"); AR at 310 (x-ray of Plaintiff's left foot showed "unremarkable" joints). Notably, when Plaintiff was asked her level of pain on a scale of "0-10," she never reported to Dr. Nadler pain above a "5." Shortly after her Plaintiff's fall in November 2002, she reported her pain was a "5," and it improved to a "3" with medication. *Id.* at 169. In February 2003, Plaintiff reported her pain was a "2-3," and by May 30, 2003, Plaintiff's pain had decreased to a "1," though she reported that she "always" felt pain. *Id.* at 156, 159, 161. Corresponding to Plaintiff's statements about decreasing pain levels, Dr. Nadler noted that Plaintiff's "RSV/CRPS" was "improving on May 30, 2003. *Id.* at 156. Further, this comment was repeated in September of 2003, when Dr. Nadler noted Plaintiff's "RSD- like syndrome improved over last few months." *Id.* at 209.

*Opinion of another treating physician*

When faced with the conflicting opinions of two treating physicians, the ALJ has the discretion to resolve the conflict. *See Burkhart v. Bowen*, 856 F.2d 1335, 1339-50 (9th Cir. 1988); *Allen*, 749 F.2d at 579. Moreover, an "ALJ is entitled to choose between different medical opinions of equal weight. Indeed, that is the ALJ's function." *Williams v. Astrue*, 2010 U.S. Dist. LEXIS 93511, at *16 (N.D. Cal. Sept. 8, 2010), citing *Andrews v. Shalala*, 53 F.3d 1035, 1042-43 (9th Cir. 1995). As noted by the ALJ, the x-rays ordered in August and September 2003 were interpreted by Dr. Wolney, another physician at Kern River Health who treated Plaintiff, as "normal." AR at 20; *see also* AR at 152-53. In addition, Dr. Wolney noted Plaintiff stated "exaggerated symptoms of [a] factitious injury," supporting this statement with the findings of normal x-rays, and the lack of inflammation and swelling. *Id.* at 153. Thus, this opinion was supported by independent clinical

tests and x-ray results, and is substantial evidence in support of giving less weight to the opinion of Dr. Nadler.

*Opinion of state agency physician*

Upon review of the medical record, Dr. Bugg found Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. AR at 250. Dr. Bugg opined Plaintiff could frequently balance, stoop, kneel, and crouch; and occasionally crawl and climb. *Id.* at 250-51. In addition, Plaintiff had no manipulative, visual, communicative or environmental limitations. *Id.* at 251. The ALJ stated he gave Dr. Bugg's opinion "more weight" because it was "supported by the record." *Id.* at 20.

The contrary opinion of a non-examining physician, when consistent with other evidence in the record, can constitute substantial evidence. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Thus, where the ALJ rejects the opinion of a treating physician, at least in part, based on the opinion of a non-examining physician, there must be additional evidence in the record to support the decision. *Lester*, 81 F.3d at 832. Here, as noted above, the ALJ cited Dr. Nadler's treatment notes and the opinion of Dr. Wolney. Further, the ALJ referenced several the findings of several physicians, such as Dr. Fraser, Dr. Deeths, and Dr. Weidman who interpreted Plaintiff's x-rays upon referral from her physicians at Kern River Health. *See* AR at 17, 19. Therefore, the opinion of Dr. Bugg is substantial evidence, also, in support of giving less weight to the opinion of Dr. Nadler.

## CONCLUSION

In seeking review of the decision denying benefits, Plaintiff's sole issue was the ALJ's assessment of Dr. Nadler. For the foregoing reasons, the Court concludes that the ALJ's evaluation of the opinion of Dr. Nadler, as one of Plaintiff's treating physicians, was proper. Substantial evidence in the record supported the specific and legitimate reasons named by the ALJ for rejecting the opinion. Therefore, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court because the ALJ applied the proper standard and his findings are supported by substantial evidence. *See Sanchez*, 812 F.2d at 510.

///

///

Accordingly, it is **HEREBY ORDERED**:

1. Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is **DENIED**; and

2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Holly Inglett.

IT IS SO ORDERED.

Dated: **February 24, 2011**               /s/ **Jennifer L. Thurston**
                                           UNITED STATES MAGISTRATE JUDGE